*Patrick Spevak v. Montgomery County,* Maryland, No. 893, September Term 2020. Opinion by Beachley, J.

**WORKERS' COMPENSATION – LE § 9-610 OFFSET FOR "SIMILAR BENEFITS" – EMPLOYEE'S SERVICE-CONNECTED TOTAL DISABILITY RETIREMENT OFFSETS ANY PERMANENT TOTAL OR PERMANENT PARTIAL WORKERS' COMPENSATION BENEFITS**

**FACTS**: Patrick Spevak, appellant, was employed by Montgomery County as a firefighter from 1979 to 2010. He sustained a back injury during his employment and, as a result of that injury, retired in 2010 after being granted a service-connected total disability retirement. Since 2010, Mr. Spevak has been receiving retirement benefits amounting to approximately 70% of his highest salary.

Mr. Spevak's hearing subsequently deteriorated, and in 2016 he filed a workers' compensation claim based on occupational hearing loss. In 2017, the Workers' Compensation Commission found that Mr. Spevak's hearing loss was causally related to his employment and awarded him permanent partial disability benefits as a result of a 21% hearing loss in his left ear. However, the Commission determined that Mr. Spevak's permanent partial benefits were completely offset pursuant to Section 9-610(a) of the Labor and Employment Article because his total disability retirement and his permanent partial workers' compensation benefits were "similar benefits" under the statute. The Circuit Court for Montgomery County affirmed the Commission's decision.

**HELD**: When an employee who is subject to the provisions of LE § 9-610(a)(l) receives a service-connected total disability retirement from his or her employer, the LE § 9-610 offset applies to any permanent total or permanent partial workers' compensation benefits the employee is awarded for injuries or diseases related to that same employment. Because Mr. Spevak's service-connected total disability retirement compensates for any and all work-related injuries he sustained in his employment with Montgomery County, he may not also receive a permanent partial workers' compensation award.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 893

September Term, 2020

_____

PATRICK SPEVAK

v.

MONTGOMERY COUNTY, MARYLAND

_____

Leahy,
Reed,
Beachley,

JJ.

_____

Opinion by Beachley, J.

_____

Filed: July 28, 2021

*Gould, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Maryland Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case of first impression requires us to interpret the "offset" provision set forth in Md. Code (1991, 2016 Repl. Vol., 2019 Supp.), § 9-610(a)(1) of the Labor and Employment Article ("LE"), which reads:

> Except for benefits subject to an offset under § 29-118 of the State Personnel and Pensions Article, if a statute, charter, ordinance, resolution, regulation, or policy, regardless of whether part of a pension system, provides a benefit to a covered employee of a governmental unit or a quasi-public corporation that is subject to this title under § 9-201(2) of this title or, in case of death, to the dependents of the covered employee, payment of the benefit by the employer satisfies, to the extent of the payment, the liability of the employer and the Subsequent Injury Fund for payment of similar benefits under this title.

We shall hold that when an employee who is subject to the provisions of LE § 9-610(a)(l) receives a service-connected total disability retirement from his or her employer, the LE § 9-610 offset applies to any permanent total or permanent partial workers' compensation benefits the employee is awarded for injuries or diseases related to that same employment.

**FACTUAL AND PROCEDURAL HISTORY**

The parties agree that there is no dispute as to the underlying facts. We will simplify the procedural history to include only those aspects that are relevant to the present appeal. Patrick Spevak, appellant, was employed by appellee Montgomery County as a firefighter from 1979 to 2010. During his employment, appellant sustained a back injury. As a result of that injury, Mr. Spevak retired in 2010 after being granted a service-connected total

disability retirement.[1]  Since 2010, he has been receiving service-connected total disability retirement benefits of $1,859.07 per week, representing approximately 70% of his highest salary.

Mr. Spevak's hearing subsequently deteriorated, and on June 24, 2016, he filed a workers' compensation claim pursuant to LE § 9-505(a) based on his occupational hearing loss.  The Workers' Compensation Commission ("Commission") found that Mr. Spevak's hearing loss was causally related to his employment, and on July 13, 2017, the Commission concluded that Mr. Spevak suffered a permanent partial disability as a result of a 21% hearing loss in his left ear.  The Commission calculated Mr. Spevak's permanent partial disability benefits at $322.00 weekly for 26.25 weeks, but also found that those benefits were completely offset under LE § 9-610(a) because his service-connected total disability retirement benefits exceeded the permanent partial disability benefits awarded by the Commission.

Mr. Spevak sought judicial review in the Circuit Court for Montgomery County. Both parties moved for summary judgment and, after a hearing, the circuit court issued a memorandum opinion granting summary judgment in favor of the County.  In doing so, the court concluded that because Mr. Spevak's service-connected total disability retirement benefits and the permanent partial disability workers' compensation benefits both resulted

---

[1] Depending on the employer, retirement benefits based on a disability from a work-related injury are referred to by various terms, including "service-connected disability," "accidental disability," or "special disability."  We will typically use the term "service-connected disability" in this opinion.

2

from a work-related injury, the benefits were "similar" under LE § 9-610. The court further found that Mr. Spevak was limited to "one wage loss replacement." The circuit court therefore applied the statutory offset. Mr. Spevak noted this timely appeal.

## DISCUSSION

### I. THE PARTIES' CONTENTIONS

Mr. Spevak acknowledges that LE § 9-610 allows an employer to offset workers' compensation payments if "similar benefits" are received by a "covered employee of a governmental unit" pursuant to "a statute, charter, ordinance, resolution, regulation or policy." Because the statute does not define the term "similar benefits," Mr. Spevak relies on caselaw construing the statute, asserting that "Maryland appellate courts have repeatedly explained . . . that in order for two types of benefits to be considered 'similar,' thereby triggering LE § 9-610's offset provision, the underlying basis for both benefits **must result from the same injury**." (Emphasis in original). Mr. Spevak concludes that, because his service-connected total disability retirement was awarded based on his back injury and the permanent partial disability workers' compensation award resulted from his subsequently-developed hearing loss, the two benefits do not result from the "same injury," and therefore the LE § 9-610 offset does not apply.

The County responds that Mr. Spevak's service-connected disability retirement benefits and subsequent workers' compensation award for hearing loss are "similar benefits" as contemplated by LE § 9-610 because both benefits result from work-related injuries. The County contrasts the present case involving a service-connected disability retirement from cases where the employee received a length-of-service retirement or

3

ordinary disability retirement. In the County's view, because Mr. Spevak's service-connected total disability retirement and his workers' compensation permanent partial disability award both relate to his physical incapacity resulting from work injuries, they are "similar" within the meaning of LE § 9-610. The County further argues that an employee "only has one wage," and in this case Mr. Spevak's "one wage" as a firefighter has been replaced by his service-connected total disability retirement. To allow Mr. Spevak to receive workers' compensation benefits for occupational hearing loss in addition to his total disability pension would, in the County's view, constitute an improper double recovery. Accordingly, the County asserts that the Commission and the circuit court correctly applied the LE § 9-610 offset.

## II. ANALYSIS

"We review a trial court's grant of a motion for summary judgment *de novo*, without deference to the legal decisions of the Commission or circuit court." *Norman-Bradford v. Balt. Cty. Pub. Schs.*, 237 Md. App. 235, 240 (2018) (citing *Long v. Workers' Ins. Fund*, 225 Md. App. 48, 57 (2015)).

When the issue on appeal concerns the interpretation of a statute, we turn to the well-settled rules of statutory construction:

> The Court defers to "the policy decisions enacted into law by the General Assembly." *Phillips v. State*, 451 Md. 180, 196 (2017). "We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Id.*
>
> > We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is

rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language. In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.

*Id.* at 196–97 (quoting *Douglas v. State*, 423 Md. 156, 178 (2011) (quoting *Evans v. State*, 420 Md. 391, 400 (2011))).

When this Court interprets an ambiguous or unclear statutory provision that is part of the Workers' Compensation Act, "additional principles of interpretation enter the equation." *Hollingsworth* [*v. Severstal Sparrows Point, LLC*, 448 Md. 648, 655 (2016)] (quoting *Montgomery Cty. v. Deibler*, 423 Md. 54, 61 (2011)). We must interpret the provision in light of the purpose of the Act, which we have stated is "to protect workers and their families from hardships inflicted by work-related injuries by providing workers with compensation for loss of earning capacity resulting from accidental injury arising out of and in the course of employment." *Id.* (quoting *Elms v. Renewal by Andersen*, 439 Md. 381, 399, (2014)). Thus, because the Act is a "remedial statute," to the extent that the plain language of the Act is ambiguous or unclear, it must be "construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes." *Id.* (quoting *Elms*, 439 Md. at 399). However, we may not "stifle the plain meaning of the Act, or exceed its purposes, so that the injured worker may prevail." *Id.* (quoting *Elms*, 439 Md. at 399). Similarly, "when the language is plain" we cannot "create an ambiguity that does not exist in order to interpret the Act more favorably to the claimant." *Id.* at 655–56.

*Reger v. Washington Cty. Bd. of Educ.*, 455 Md. 68, 95–97 (2017).

The County correctly notes that no Maryland case has considered this precise issue—whether the LE § 9-610(a) offset applies when an employee is receiving service-connected total disability retirement benefits based on one injury and is then awarded permanent partial workers' compensation benefits based on a second, separate injury. We will begin our analysis by surveying, in chronological order, the appellate decisions

5

applying the statutory offset to service-connected disability retirement benefits, and then consider how *Reger*, a single-injury ordinary disability retirement case that is central to Mr. Spevak's argument, fits within that analytical framework. We will ultimately hold that Mr. Spevak's service-connected total disability retirement benefits are similar to his permanent partial disability benefits, thus triggering the LE § 9-610(a) offset.

## A. THE SERVICE-CONNECTED DISABILITY RETIREMENT CASES

### *Nooe v. City of Baltimore*

*Nooe v. City of Balt.*, 28 Md. App. 348 (1975), was the first case involving a service-connected disability retirement after the statute reached its substantially current form.[2] Mr. Nooe was a patrolman for the Baltimore City Police Department and was injured on September 6, 1972, in a work-related motorcycle accident. *Id.* at 353, n.2. Mr. Nooe retired

---

[2] As explained in *Reger*, the prior statute was repealed by the General Assembly in 1970, apparently as a result of the Court of Appeals's decision in *Montgomery Cty. v. Kaponin*, 237 Md. 112 (1964). *Reger*, 455 Md. at 103–04 (citing *Blevins v. Balt. Cty.*, 352 Md. 620, 636–37 (1999)). The General Assembly then enacted Article 101 § 33 as an emergency measure, providing, in pertinent part:

> Whenever by statute, charter, ordinances, resolution, regulation or policy adopted thereunder, whether as part of a pension system or otherwise, any benefit or benefits are furnished employees of (public) employers . . ., the benefit or benefits when furnished by the employer shall satisfy and discharge pro tanto or in full . . ., the liability or obligation of the employer . . . for any benefit under this article. If any benefits so furnished are less than those provided for in this article the employer . . . shall furnish the additional benefit as will make up the difference between the benefit furnished and the similar benefit required in this article.

*Id.* at 104–05 (alterations in original) (emphasis removed).

pursuant to a service-connected disability[3] and received $17.31 bi-weekly as an annuity, and $252.90 bi-weekly as a pension. *Id.* at 354. On July 10, 1974, the Commission found that Mr. Nooe had sustained a 50% permanent partial disability. *Id.* at 353. The parties conceded "that the benefits under the pension plan [were] greater than those required" under workers' compensation. *Id.* at 354.

Because Mr. Nooe was receiving service-connected disability retirement benefits, and because his retirement benefits were greater than the workers' compensation award, the Commission held that the workers' compensation benefit was "barred under Article 101 Section 33."[4] *Id.* at 353. The Circuit Court for Baltimore City affirmed the Commission on judicial review. *Id.* On appeal to this Court, Mr. Nooe argued that § 33 applied only to cases in which the employee had died. *Id.* at 355. We disagreed based on the plain language of the statute, and held that the payment to Mr. Nooe of the service-connected disability pension "satisfied and discharged in full the liability or obligation" of the employer for permanent partial disability benefits under workers' compensation law. *Id.* at 356.

*Mazor v. State Department of Correction*

Two years after *Nooe*, the Court of Appeals decided *Mazor v. State Dep't of Corr.*, 279 Md. 355 (1977). Mr. Mazor worked as a penitentiary guard for the Department of

---

[3] Termed "special disability" under the Baltimore City ordinance.

[4] As noted, Article 101, § 33, enacted in 1971, was the predecessor to LE § 9-610, and contained substantially the same offset provision.

Correction and suffered severe injuries when he was stabbed and beaten at work on July 17, 1972. *Id.* at 357. On September 1, 1973, he retired based on an accidental (service-connected) disability and began receiving $421.59 monthly as a pension and $26.75 monthly as an annuity. *Id.* Mr. Mazor applied for workers' compensation benefits as well, and the parties presented four issues to the Commission—whether the "pension benefits were equal to or better than any benefit provided" by workers' compensation;[5] whether § 33 discharged the insurer's (as opposed to the employer's) liability; whether the offset only applied where the accident resulted in death; and whether applying § 33 to the case would be unconstitutional. *Id.* at 359. The Commission determined that Mr. Mazor suffered a permanent 60% disability and that Mr. Mazor's pension benefits were equal to or better than the amount of workers' compensation he would have received. *Id.* However, the Commission "rejected the contention that the insurer, as distinguished from the employer, was entitled to a discharge." *Id.* It therefore did not apply the offset and awarded Mr. Mazor $65 per week ($281.67 per month) in permanent disability benefits. *Id.* The Commission did not reach the final two issues. *Id.*

On judicial review, the Circuit Court for Harford County granted the insurer's motion for summary judgment, holding that the offset applied to the insurer as well as the employer; that the offset was not limited to death cases; and that the statute did not violate any of Mr. Mazor's constitutional rights. *Id.* at 359–60. Our Court affirmed. *Id.* at 360.

---

[5] Mr. Mazor later conceded that his pension benefits were equal to or greater than his possible workers' compensation benefits. *Id.* at 360.

8

The Court of Appeals agreed with both the circuit court and Court of Special Appeals that § 33 "not only provides for discharge of employers, but also applies in the same manner to insurers." *Id.* at 361. If the statute did not apply to insurers, it "would produce an anomalous consequence, whereby the insurer conceivably would pay benefits to the employee without receiving premiums from the employer. For the same reason, the effect of such an interpretation on self-insured employers . . . would differ from that on employers who are not self-insured." *Id.*

The Court of Appeals, relying on *Nooe* as persuasive authority, held that the offset was not limited to cases where the injury resulted in death.

> Our holding recognizes that workmen's compensation is one facet of an overall system of wage-loss protection, and that the underlying principle of the system is to restore to the worker a portion of wages lost by physical disability, unemployment, or old age. It follows that although two or more causes of wage loss may coincide, the benefits need not cumulate, for the worker experiences but one wage loss.

*Id.* at 363. Finally, the Court of Appeals rejected Mr. Mazor's constitutional challenges to the statute. *Id.* at 364–70. We note that Mr. Mazor apparently conceded that, unless he prevailed on one of the above statutory interpretation arguments, § 33 would apply and completely offset his workers' compensation award against his service-connected disability pension. *Id.* at 360.

*Frank v. Baltimore County*

In *Frank v. Balt. Cty.*, 284 Md. 655 (1979), the Court of Appeals considered whether the § 33 offset applied to contributory pension plans, and held that "a pension received

9

under such a plan is a 'benefit provided by the employer,'" and thus subject to offset. *Id.* at 657. In reaching that conclusion, the Court considered the legislative intent:

> Upon reading section 33 the scheme that unmistakably emerges is that the General Assembly wished to provide only a single recovery for a single injury for government employees covered by both a pension plan and workmen's compensation. Consequently, this section not only provides that when disability pension benefits exceed workmen's compensation the latter shall be completely eliminated, but also directs that when pension benefits happen to be less than workmen's compensation, the employer is required to furnish additional benefits which, when added to it, will equal the compensation award.

*Id.* at 659. The Court then noted that this construction of the statute "is also consistent with the generally recognized policy underlying all wage-loss legislation," which is "'to restore to the worker a portion'" of lost wages. *Id.* (quoting 4 A. Larson, The Law of Workmen's Compensation § 97.10 (1979)). The Court further quoted Larson, stating that, where employees experience multiple causes of wage loss, they nonetheless "experienc[e] only one wage loss and, in any logical system, should receive only one wage-loss benefit." *Id.* Similar to *Mazor*, because Mr. Frank's service-connected disability pension benefits exceeded the workers' compensation award, he apparently conceded that § 33 would fully discharge the employer's liability to pay the workers' compensation award in the event the court rejected his argument that the offset did not apply to contributory pension plans.

*Tsottles v. Baltimore City*

*Tsottles v. Balt. City*, 55 Md. App. 58 (1983), was the first case involving service-connected disability retirement benefits in the context of two separate work-related injuries from the same employment. Mr. Tsottles sustained two injuries while working as a teacher for the Baltimore City Department of Education—one in 1966 and the other in 1979. *Id.*

10

at 59. "The combined effect of these accidents resulted in his being retired under the State of Maryland Retirement System" on April 1, 1980, receiving $1,247.48 monthly.[6] *Id.* Mr. Tsottles then applied for workers' compensation benefits related to his injuries. "On 17 February 1981, the Workmen's Compensation Commission found [Mr. Tsottles] to have a sixty percent permanent partial disability, thirty percent of which was attributable to the 1979 accidental injury and thirty percent of which was attributable to the 1966 accidental injury." *Id.* at 60. The Commission ordered the Mayor and City Council of Baltimore to pay Mr. Tsottles $74.00 per week in permanent partial disability benefits, and ordered the Subsequent Injury Fund to make payments at the same rate after the City's obligation ended. *Id.* On judicial review, the Circuit Court for Baltimore City granted summary judgment in favor of the employer and Subsequent Injury Fund on the basis that "the pension benefits exceeded the compensation benefits." *Id.*

Mr. Tsottles appealed to this Court, arguing that the offset did not apply because the benefits were being paid by two different government entities: the State of Maryland paid his pension, while the Mayor and City Council of Baltimore paid his workers' compensation benefits. *Id.* at 61. To determine whether the offset applied, we looked to *Dennison v. Head Constr. Co.*, 54 Md. App. 310 (1983).

---

[6] The *Tsottles* opinion does not explicitly characterize Mr. Tsottles's retirement as a *service-connected* disability retirement, but because the "accidents resulted in his being retired," 55 Md. App. at 59, we infer that he was granted a service-connected disability retirement.

11

*Dennison* involved an employee who was injured in 1965 while working for an employer in Maryland, for which he was awarded permanent partial disability Maryland workers' compensation benefits. *Dennison*, 54 Md. App. at 311. He was injured again in 1976 while working for an employer in the District of Columbia, for which he was awarded permanent total disability federal workers' compensation benefits. *Id.* at 312. Both injuries affected his lower back. *Id.* The *Tsottles* Court, referring to *Dennison*, stated:

> This Court held that, where the loss of wage earnings capacity is predicated upon the same anatomical disability, a claimant is precluded from the payment of double compensation for the same loss of wage earning capacity even when payments would be made by two separate jurisdictions. The decision was based on the common proposition running through workmen's compensation cases:
>
> > . . . Maryland law does not permit double recovery for the same loss of wage earning capacity even if the claim involves two separate employers and two separate injuries.

*Tsottles*, 55 Md. App. at 62 (alteration in original) (quoting *Dennison*, 54 Md. App. at 319). Although *Dennison* involved two workers' compensation awards from different jurisdictions rather than a service-connected disability retirement, the Court notably held that the employee's award of "maximum benefits from the District of Columbia employer" as a result of permanent total disability precluded an award of additional workers' compensation benefits from his Maryland employer. *Dennison*, 54 Md. App. at 317, 19.

In *Tsottles*, we quoted Larson's *Workmen's Compensation Law*: "Once it is recognized that workmen's compensation is one unit in an overall system of wage-loss protection, . . . the conclusion follows that duplication of benefits from different parts of the system should not ordinarily be allowed." *Tsottles*, 55 Md. App. at 62 (quoting Larson,

12

*supra*, § 97.00). We concluded that § 33 "gives expression to an overall systems approach to wage-loss compensation in the public sector by coordinating the various government benefits such that one wage-loss benefit is paid for one wage loss," and held that § 33 applied even where the benefits were provided by different governmental employers. *Id.* at 63. Accordingly, we held that the employer's and Subsequent Injury Fund's liability for workers' compensation benefits resulting from the two injuries in 1966 and 1979 from the same employment was extinguished by the disability pension benefits.

*Fikar v. Montgomery County*

On August 15, 1989, Ms. Fikar was injured while working as a correctional officer for the Montgomery County Department of Corrections. *Fikar v. Montgomery Cty.*, 333 Md. 430, 431–32 (1994). She received temporary total disability benefits from August 15, 1989 through March 1991. *Id.* at 432. In March 1991, Ms. Fikar began receiving vocational rehabilitation benefits. *Id.* These benefits consisted of "$350.00 per week plus medical bills and $.25 per mile for mileage for medical appointments." *Id.* at 433. Because she was unable to return to work as a result of the workplace injury, she obtained a service-connected disability retirement benefit and started collecting benefits on August 2, 1991. *Id.* at 432. The Commission held that the § 33 offset did not apply to vocational rehabilitation benefits, but the circuit court reversed. *Id.* at 433. Ms. Fikar appealed the circuit court's decision, and the Court of Appeals issued a writ of certiorari prior to this Court's consideration of the appeal. *Id.* Although Ms. Fikar conceded on appeal that her disability retirement benefits "would trigger an offset of any future disability payments she may receive under the workers' compensation scheme, as both categories of benefits are

13

intended to compensate her for her loss of earning capacity," she argued that vocational

rehabilitation benefits were not "similar" to disability retirement benefits. *Id.* at 436.

Following its reasoning in *Newman v. Subsequent Injury Fund*, 311 Md. 721 (1988),

the Court of Appeals held that the offset applied to the cash payment portion of the

vocational rehabilitation benefit award. *Fikar*, 333 Md. at 435–39. The Court related the

holding of *Newman* to other cases:

> Thus, while ordinary retirement benefits may not trigger the offset, *it is well settled that disability pension benefits are "similar" to workers' compensation payments and will trigger the offset*, even if the disability pension benefits result from a contributory pension plan, *Frank v. Baltimore County*, 284 Md. at 660, and even when the workers' compensation benefits and the disability retirement benefits are not traceable to the same governmental employer. *Tsottles v. City of Baltimore*, 55 Md. App. 58, 63 (1983).

*Fikar*, 333 Md. at 436 (emphasis added). Noting that vocational rehabilitation benefits

may include different types of benefits, the Court separately analyzed each aspect of Ms.

Fikar's award. *Id.* at 437–38. The Court held that the non-cash vocational rehabilitation

services such as counseling and job placement were not similar to her disability retirement

benefits and thus did not trigger the offset provision. *Id.* at 439. However, the Court held

that the cash payment portion of the vocational rehabilitation benefits was "quite similar to

disability retirement benefits," and thus subject to the offset, analogizing the payments to

temporary total disability benefits. *Id.* at 438. Indeed, the portion of the statute allowing

for cash payments as a part of vocational rehabilitation provided: "An employee receiving

vocational rehabilitation services is entitled to compensation as if temporarily totally

disabled." *Id.* at 437 (quoting Art. 101, § 36(8)(e) (1989)). The Court also looked to the

purpose of the cash payments, noting that the payments "arise[] from an injury which occurred in the course of employment," and are "intended to be a partial substitute wage while the beneficiary is recovering or retraining." *Id.* at 438. The Court concluded, "As such, the cash payment is subject to the same offset that would apply if a beneficiary was receiving temporary total disability payments. The plain language of the statute is such that we can reach no other conclusion." *Id.*

Lastly, the Court noted that, if the offset did not apply, Ms. Fikar would receive "payments equal to four-thirds of her prior salary"—two-thirds from her service-connected disability retirement and two-thirds resulting from the workers' compensation award for vocational rehabilitation payments. *Id.* at 438–39, n.5. The Court "[did] not believe that the Legislature intended to allow such a windfall." *Id.* at 439 n.5.

*Board of Education of Prince George's County v. Brady*

The most recent case concerning LE § 9-610 in the context of service-connected disability retirement benefits is *Bd. of Educ. of Prince George's Cty. v. Brady*, 228 Md. App. 545 (2016). On April 8, 2011, Mr. Brady was injured while working as a mechanic for the Board of Education of Prince George's County. *Id.* at 546–47. After several treatments, he was unable to return to work. *Id.* at 547. Mr. Brady received ninety days of paid leave as guaranteed by his union's contract with the Board of Education, ending February 14, 2012. *Id.* After the expiration of the ninety-day period, Mr. Brady elected to use his accrued sick leave in order to retain his full wages and benefits, in lieu of seeking temporary total disability benefits under the Maryland Workers' Compensation Act. *Id.* at 547–48. After he depleted his accrued sick leave, Mr. Brady applied for and began

15

receiving $865.65 per week in service-connected disability retirement benefits commencing on July 1, 2013. *Id.* at 548. He then filed a workers' compensation claim for permanent partial disability.

The Commission granted permanent partial disability benefits of $705 per week for a period of 333 weeks beginning February 15, 2012 (the day after his ninety-day union contract paid leave ended). *Id.* However, the Commission found that the benefits were subject to a complete offset under LE § 9-610 based on the sick leave payments between February 15, 2012 and July 1, 2013 (the "gap period"). *Id.* Mr. Brady sought judicial review, and the Circuit Court for Prince George's County reversed the Commission's offset order. *Id.* at 549–50. The Board of Education appealed that decision.

The sole issue on appeal was whether the Board of Education was entitled to an offset of the sick leave money paid to Mr. Brady against workers' compensation benefits ordered for the same gap period. *Id.* at 552. This Court first noted that "the meaning of the word 'benefit' and the application of 'similar benefits' has been applied broadly," *id.* at 553 (citing *Garrett v. Bd. of Educ. for Prince George's Cty.*, 94 Md. App. 169, 179 (1992)), and "[t]he question of whether the second payment was in the nature of the first is important to the analysis, but is not the sole point of examination as we are guided also by [a] sense of justice," *id.* at 554.

We then compared the facts to *Blevins v. Balt. Cty.*, 352 Md. 620 (1999), which concerned "whether the set-off applies to workers' compensation benefits awarded after a county employee retired and began receiving disability retirement benefits pursuant to the county's employee retirement plan but for a period preceding the effective date of the

16

employee's retirement." *Brady*, 228 Md. App. at 554–55 (emphasis removed) (quoting *Blevins*, 352 Md. at 623). In that case, Mr. Blevins suffered a work-related injury, but continued to work for some time until he was approved for service-connected disability retirement. After he retired, he applied for and was awarded permanent partial disability benefits, based on those same injuries, for the period of time *prior* to his retirement. *Id.* at 555 (citing *Blevins*, 352 Md. at 623–24). The Court of Appeals held that the offset did not apply because "[t]he workers' compensation benefits were awarded for a weekly period prior to his retirement, when he was not receiving and was not entitled to receive any offsetting retirement benefits." *Id.* at 556 (quoting *Blevins* at 627).

Concluding that sick leave is "of the same nature" as temporary total disability benefits, we held in *Brady* that the offset applied. *Id.* at 556, n.5. We specifically held that the sick leave benefits paid by the Board of Education between February 15, 2012, and July 1, 2013, offset the permanent partial disability workers' compensation award applicable to that same period (February 15, 2012, to July 1, 2013). *Id.* at 546, 558–59. We concluded that, because Mr. Brady's sick leave paid him his full wages, it "exceeded what he would have received under any workers' compensation award. To refuse the Board of Education an offset of these funds would go against the Legislature's intent that an injured employee is entitled to a single recovery for a single injury." *Id.* at 559.

Notably for purposes of the present case, Mr. Brady "conceded that permanent partial benefits were not payable after" the date of his retirement (July 1, 2013), under § 9-610. *Id.* at 557 n.7. The Court agreed:

17

Once Brady retired on 1 July 2013, he began to receive his accidental disability retirement. *Disability pensions and workers' compensation benefits are considered to be similar benefits under L&E § 9–610. See Newman v. Subsequent Injury Fund*, 311 Md. 721, 728 (1988) (applying § 33(c)); *see also Oros v. City of Baltimore*, 56 Md. App. 685, 692 (1983) (explaining that "by reason of [the] disability retirement election[,] the disability compensation benefit is "similar" in every sense to that of a disability pension [and t]he election to retire mooted whatever lost earning capacity purpose the compensation benefit may originally have contemplated").

*Id.* (alterations in original) (emphasis added). In other words, because Mr. Brady's accidental disability retirement benefits that he started receiving on July 1, 2013, exceeded his permanent partial disability workers' compensation benefits, the offset applied and the Board of Education's liability for worker's compensation benefits after July 1, 2013, was extinguished.

Although the service-connected disability retirement cases discussed above do not address the precise issue in the instant case, these cases demonstrate that our appellate courts have applied the LE § 9-610 offset in a variety of contexts. It is also apparent that the parties in these cases and the courts agreed that the LE § 9-610 offset applies where a single work-related injury provides the basis for both the service-connected disability retirement and permanent total or permanent partial workers' compensation benefits, *i.e.*, a service-connected disability retirement benefit is "similar" to a permanent disability award under workers' compensation law. Moreover, *Tsottles* held that the combination of two work-related injuries—one occurring in 1966 and the other in 1979—that resulted in 60% permanent disability benefits under workers' compensation were fully offset by the employee's disability retirement benefits. 55 Md. App. at 60, 63–64. The opinion is

18

unclear whether Mr. Tsottles's injuries were to the same anatomical part; if they were, that fact would distinguish *Tsottles* from the case at bar. In any event, the service-connected disability retirement cases discussed above do not squarely address whether the offset applies where the employee receives a service-connected total disability retirement for one injury (here, Mr. Spevak's back injury) and then is awarded permanent partial workers' compensation benefits for a separate injury (here, Mr. Spevak's permanent partial disability resulting from occupational hearing loss). We now turn to *Reger*, which forms the foundation for Mr. Spevak's appellate argument.

B. *REGER V. WASHINGTON COUNTY BOARD OF EDUCATION*: AN ORDINARY DISABILITY RETIREMENT CASE

Mr. Reger worked as a custodian for the Washington County Board of Education and injured his back and neck at work while moving a cafeteria table. 455 Md. at 77. Because of his injuries, he was unable to perform his regular custodial work. *Id.* Mr. Reger was granted temporary total disability benefits by the Workers' Compensation Commission. *Id.* Additionally, Mr. Reger sought accidental disability retirement benefits through the State Retirement Agency.[7] *Id.* at 82. The State Retirement Agency denied accidental disability retirement but approved ordinary disability retirement benefits based on his back injury. *Id.* at 82–83. In response to the Board of Education's request to apply the LE § 9-610(a) offset, the Commission found that "during all three periods in which Mr. Reger received temporary total disability benefits, he also received ordinary disability

---

[7] The State's accidental disability retirement is equivalent to Montgomery County's service-connected disability retirement.

19

retirement benefits." *Id.* at 88. Thus, the Commission ruled that the LE § 9-610(a) offset applied, and found that the employer was entitled to a credit of $62,808.68 (representing ordinary disability retirement benefits paid while Reger was also receiving temporary total disability benefits), which the employer could apply against future workers' compensation awards. *Id.*

Mr. Reger challenged the offset on judicial review to the Circuit Court for Washington County, arguing that the ordinary disability retirement benefits were based solely on a pre-existing back condition, which was exacerbated by the work injury. *Id.* at 89–90. The circuit court and the Court of Special Appeals affirmed the Commission's determination that the offset applied. *Id.* at 91–92. Both courts emphasized that the same evidence was presented before both the Commission and the State Retirement Agency. *Id.* Additionally, both courts relied on *Reynolds v. Bd. of Educ. of Prince George's Cty.*, 127 Md. App. 648 (1999), concluding that "both sets of benefits were awarded for wages lost," and noted that "Mr. Reger submitted both of his claims based on the same medical condition and physical incapacity." *Reger*, 455 Md. at 91–92.

The Court of Appeals affirmed, but expressly rejected the "wage loss" theory, instead relying on a "same injury" theory derived from a number of appellate decisions interpreting LE § 9-610 (and its statutory predecessors). The Court of Appeals, relying substantially on its decision in *Blevins*, provided a thorough review of the legislative history of LE § 9-610(a) and cases interpreting it, concluding:

> We distill the following three principles from the above-described legislative history of LE § 9–610, and the cases that have applied and clarified the statutory offset provision. First, the overall legislative intent

20

behind the offset provision now contained in LE § 9-610 was "that the General Assembly wished to provide only a single recovery for a single injury for government employees covered by both a pension plan and [workers'] compensation," and to thereby prevent employees from receiving a double recovery for the same injury. *Fikar*, 333 Md. at 435 (quoting *Frank*, 284 Md. at 659).

Second, as clarified in *Newman*, the specific language in the statute that "payment of the benefit by the employer satisfies, to the extent of the payment, the liability of the employer . . . for payment of **similar benefits** under this title" reflects a legislative intent that the offset apply only to "comparable" benefits, which are "**benefits accruing by reason of the same injury**." 311 Md. at 727 (emphasis added). *See also Fikar*, 333 Md. at 439 (holding that the statutory offset applied because cash payments the petitioner was paid as part of her vocational rehabilitation benefits were awarded "because of the same injuries sustained in the same accident which occurred in the course of her employment" that was also the basis for her disability pension benefits); *Polomski* [*v. Mayor & City Council of Balt.*, 344 Md. 70, 81 (1996)] (holding that "similar benefits for the same injury trigger the offset provision of Art. 101, § 33(d) [later recodified at LE § 9–610]" whereas "[d]issimilar benefits [] render the offset provision inapplicable"); *Blevins*, 352 Md. at 642 (noting that pursuant to our holding in *Newman*, "the only benefits that a county was entitled to set off against a workers' compensation award were those that were similar to the compensation benefits—those which, if not set off, would permit a double recovery for the same injury"). When benefits are not traceable to the same injury, they are dissimilar, and the statutory offset does not apply. *Newman*, 311 Md. at 728.

Third, although early cases discussing the statutory offset provision suggested it should apply to offset workers' compensation benefits against any other benefit that compensates the employee for wage loss, this Court explicitly rejected that rationale in *Newman*, emphasizing that "our statute focuses only on dual recoveries for a single on-the-job injury" and "does not encompass setoffs for every type of wage-loss benefit available." *Id.* at 727.

*Reger*, 455 Md. at 116–17 (alterations in original).

Mr. Reger argued that, as a matter of law, ordinary disability retirement benefits could never be offset by workers' compensation benefits under LE § 9-610. He reasoned that "because ordinary disability benefits 'do not compensate for work-related injuries,'

21

those benefits are therefore not a 'similar benefit' to workers' compensation benefits." *Id.* at 118. We note that Mr. Reger conceded that service-connected disability retirement benefits, because they are awarded as a result of workplace injuries, are "perfectly analogous to workers' compensation benefits." *Id.*

Addressing Mr. Reger's argument, the Court relied on *Newman*, stating:

the "purpose" for which ordinary disability benefits are awarded—whether to compensate for lost wages, or for loss of future earning capacity, or for some other purpose—is entirely irrelevant to our analysis of whether the statutory offset in LE § 9–610 can apply to offset those benefits against a workers' compensation award. Instead, the only relevant inquiry is whether ordinary disability benefits can, as a matter of law, be "similar" to workers' compensation benefits—meaning that the two sets of benefits were awarded as a recovery for the same injury or, in other words, stemmed from the same cause.

*Reger*, 455 Md. at 118.

Crucial to the Court's decision was the difference in the statutory requirements to prove entitlement to temporary total disability benefits under workers' compensation law as opposed to benefits awarded for an ordinary disability retirement. Temporary total disability benefits can be awarded only as a result of a work-related injury or occupational disease; "ordinary disability [retirement] benefits may be awarded for **any** mental or physical injury that renders the employee unable to perform the normal duties of his position." *Id.* at 120–21. Because ordinary disability retirement benefits may or may not be predicated on a work-related injury, the Court held that "if the record reflects that the cause of the incapacity for which ordinary disability retirement benefits were awarded was the same workplace accidental injury or occupational disease that was the basis for a workers' compensation award, the two sets of benefits are 'similar'" for the purposes of

22

the LE § 9-610 offset. *Id.* at 121. In short, the Court held that when faced with determining whether ordinary disability retirement and workers' compensation benefits are similar, one must examine the record evidence undergirding both claims.

Further, the Court rejected Mr. Reger's argument that the State Retirement Agency's denial of his accidental disability retirement meant that his back and neck injuries were caused by preexisting, non-work-related conditions. Although that was *a* plausible interpretation of the State Retirement Agency's decision, it was equally plausible that Mr. Reger did not satisfy the more stringent burden of proof required for an accidental disability retirement. *Id.* at 124. The Court noted that "the State Retirement Agency applies a different legal standard when making disability benefit determinations than the WCC applies when deciding whether to award temporary total disability benefits." *Id.* at 125. The Court concluded,

> Thus, a claimant seeking accidental disability retirement benefits who also suffers from preexisting conditions must show that his injury and resultant incapacity were caused by the work accident, as opposed to . . . the natural degeneration or progression of the preexisting condition.
>
> In contrast, temporary total disability benefits are to be awarded "without regard to pre-existing disease or infirmity."
>
> * * *
>
> Consequently, when evaluating the same set of facts, the State Retirement Agency may well determine that it was the natural progression or degeneration of the preexisting condition, and not the accident, that was the natural and proximate cause of the injury, and grant the employee ordinary disability benefits instead of accidental disability benefits. Critically, in such a situation, although the WCC and State Retirement Agency may reach different conclusions as to the cause of the employee's injury—because each agency applies a different legal standard—both sets of benefits would be awarded for the same overall injury.

23

*Id.* at 126–27 (citations removed).

The *Reger* Court then considered *Reynolds*, 127 Md. App. 648, involving a bus driver who "was awarded permanent partial disability benefits 'as the result of a work-related occupational disease resulting from exposure to diesel fuel.'" *Reger*, 455 Md. at 127 (quoting *Reynolds*, 127 Md. App. at 650–51). Ms. Reynolds was denied accidental disability retirement benefits, but was awarded ordinary disability retirement benefits "based on a finding of chronic asthma with an allergic reaction to fuel and diesel fumes."[8] *Id.* (quoting *Reynolds*, 127 Md. App. at 651). On appeal, this Court held that Ms. Reynolds's workers' compensation benefits were offset by the retirement benefits because the two were similar. *Id.* at 128 (citing *Reynolds*, 127 Md. App. at 655). *Reynolds* based its holding on two rationales: (1) the offset should apply because "the same physical incapacity on the part of [Ms. Reynolds] formed the basis for the workers' compensation award and for the ordinary disability retirement award," and (2) "[t]he ordinary disability retirement benefit is tantamount to a wage loss benefit,' and therefore is 'similar to a workers' compensation award." *Id.* at 128–29 (second alteration in original) (quoting *Reynolds*, 127 Md. App. at 655).

The *Reger* Court agreed with the first rationale but disagreed with the second. *Id.* at 129–30. In rejecting the "wage loss" theory, *Reger* cited to *Newman*'s statement that the offset "'focuses only on dual recoveries for a single on-the-job injury' and 'does not

---

[8] At the time of the *Reynolds* decision, the State Retirement and Pension System did not award accidental disability retirement benefits for occupational diseases. *Id.* at 128.

encompass setoffs for every type of wage-loss benefit available.'" *Id.* at 130 (quoting *Newman*, 311 Md. at 727). The Court noted that an employee who receives ordinary disability retirement is not precluded from working in the future.

> Thus, an employee could hypothetically retire from a governmental employer on ordinary disability benefits for one incapacity, return to the workforce in a new position, and later incur a separate and distinct injury, for which he receives temporary total disability benefits from his new employer. In that event, he would be receiving two wage-loss benefits, but for different injuries, and the benefits should not be offset merely because both benefits are designed to compensate him for lost wages.

*Id.* at 130–31.

The Court of Appeals held that (1) "the legislative intent behind the overall offset provision . . . is to prevent [employees subject to LE § 9-610] from receiving a double recovery for the same injury," (2) the legislative intent behind the "similar benefit" language "was that the offset apply only to 'comparable' benefits, which are 'benefits accruing by reason of the same injury,'" and (3) "ordinary disability benefits can be legally similar to workers' compensation benefits, if the record reflects that the cause of the incapacity for which ordinary disability benefits were awarded was the same workplace accidental injury or occupational disease that was the basis for the workers' compensation benefits." *Id.* at 135–36 (quoting *Newman*, 311 Md. at 727). The Court concluded that, because Mr. Reger's ordinary disability retirement benefits and temporary total disability workers' compensation award were based on the same injury, the benefits were "similar," and the LE § 9-610 offset applied.

In our view, *Reger* must be read in the context of the facts and issues presented there—whether *ordinary* disability retirement benefits may be offset by workers'

25

compensation benefits. Because ordinary disability retirement can be based on a work injury, a non-work-related injury, or a combination of both, the Court compared the evidence that supported Mr. Reger's ordinary disability retirement claim with the evidence supporting his workers' compensation claim.[9] Because the same injury evidence was used to support both claims, the Court held that the offset applied. Thus, *Reger*'s holding is in perfect accord with all of the service-connected disability retirement offset cases previously discussed—because Mr. Reger's *ordinary* disability retirement benefits were work-related, the offset principles uniformly adopted in the *service-connected* disability retirement cases applied to Mr. Reger. In other words, to determine whether the offset applies to an *ordinary* disability retirement, the tribunal needs to determine whether the ordinary disability retirement was awarded based on the same *service-connected* injury.

C. MR. SPEVAK'S SERVICE-CONNECTED TOTAL DISABILITY RETIREMENT BENEFITS ARE "SIMILAR" TO ANY WORKERS' COMPENSATION AWARD FOR PERMANENT TOTAL OR PARTIAL DISABILITY

We regard our extensive review of the caselaw construing the LE § 9-610 offset as beneficial to understanding practical applications of the statute's offset provision. But the parties acknowledge that the extant caselaw does not address the precise issue presented in the case at bar, which involves a service-connected total disability retirement awarded in

---

[9] The County argues that, instead of *Reger*, we should look to *Zakwieia v. Balt. Cty. Bd. of Educ.*, 231 Md. App. 644 (2017). However, not only does *Zakwieia* also concern ordinary disability retirement, it relies entirely upon the portion of *Reynolds* that *Reger* rejected. *Reger*, 455 Md. at 129–30, n.28.

26

2010 based on Mr. Spevak's back injury, and a subsequently-developed occupational disease that resulted in a permanent partial disability award for hearing loss in 2017.

Before we proceed, we must take a step back to understand the nature and legal effect of Mr. Spevak's service-connected total disability retirement. Section 33-43 of the Montgomery County Code governs "disability retirement" for County employees. Section 33-43(f)(1)(A) provides:

> (1) A member may be retired on a service-connected disability retirement if:
>   (A) the member is totally or partially incapacitated as the natural and proximate result of an accident occurring, or an occupational disease incurred or condition aggravated while in the actual performance of duty[.]

Section 33-43(b) defines "partial incapacity" and "total incapacity" as follows:

> *Partial incapacity* means a member's inability to perform one or more essential functions of the position the member holds because of impairment that:
>
> (1)  is unlikely to resolve in the next 12 months;
>
> (2)  may be permanent; and
>
> (3)  does not prevent the member from performing any other substantial gainful activity.
>
> *Total incapacity* means the member's inability to perform substantial gainful activity because of an impairment that;
>
> (1)  is unlikely to resolve in the next 12 months; and
>
> (2)  may be permanent.

Accordingly, the principal definitional difference between partial and total incapacity in the Montgomery County Code is that partial incapacity "does not prevent the member from

performing any other substantial gainful activity."[10]

The parties agree that Mr. Spevak was awarded a "total incapacity" service-connected disability retirement, pursuant to which he receives, tax-free, approximately 70% of his final earnings.[11, 12] The County points out that, because Mr. Spevak is retired on a "total incapacity service-connected disability retirement" for which he receives 70% of his final earnings, it would make no difference whether he was totally disabled due to 1) his back injury, 2) his occupational hearing loss, or 3) a combination of both his back injury and hearing loss. Indeed, the County posits that in light of Mr. Spevak's receipt of "total incapacity" disability retirement benefits, it makes no difference "whether he has one or twelve work related conditions"—the 70% of final earnings payment remains unchanged and encompasses all work-related injuries. Similarly, the County points out that an

---

[10] "Substantial gainful activity" is defined under section 33-43(b) as "a level of productive work that requires significant physical or mental duties, or a combination of both, performed for pay or profit on a full-time or part-time basis. An individual is able to perform a substantial level of work if the individual is able to earn more than the U.S. Social Security Administration's current monthly earnings limit for a disabled person. The County must give the term substantial gainful activity the same meaning as the term is given by the U.S. Social Security Administration."

[11] Pursuant to Section 33-43(i)(1), "The County must pay a member who retires on service-connected disability retirement with total incapacity an annual pension calculated under Section 33-42(b)(1) ["Amount of pension at normal retirement date"], except that: (A) the County must substitute final earnings for average final earnings; and (B) the pension must be at least 70% of the member's final earnings." In circumstances not present in this case, an award of service-connected disability retirement for total incapacity may be reduced. See § 33-43(j).

[12] Pursuant to Section 33-43(i)(4), "a member who retires with partial incapacity on a service-connected disability retirement" receives "at least 52 ½ %" of the member's final earnings.

employee who is permanently totally disabled under the Workers' Compensation Act may receive two-thirds of the employee's average weekly wage,[13] not to exceed the "State average weekly wage" as set forth in LE § 9-603.[14] Thus, an employee deemed permanently and totally disabled under workers' compensation cannot receive more than the "State average weekly wage." In 2017, the year Mr. Spevak received his workers' compensation award, the "State average weekly wage" was $1,052. *Md. Workers' Compensation Rates*, Md. Workers' Compensation Commission, wcc.state.md.us/ Adjud_Claims/Comp_Rates.html (last visited July 13, 2021). In the County's view,

---

[13] LE § 9-637(a) provides:

(a) *Amount of payment*. — (1) Except as provided in paragraph (2) of this subsection, if a covered employee has a permanent total disability resulting from an accidental personal injury or an occupational disease, the employer or its insurer shall pay the covered employee compensation that equals two-thirds of the average weekly wage of the covered employee, but may not:
   (i) exceed the State average weekly wage; or
   (ii) be less than $25.
(2) If the average weekly wage of the covered employee is less than $25 at the time of the accidental personal injury or last injurious exposure to the hazards of the occupational disease, the employer or its insurer shall pay the covered employee weekly compensation that equals the average weekly wage of the covered employee.
(3) Payments under paragraph (1) or (2) of this subsection may not exceed a total of $45,000.

[14] LE § 9-603 provides:

On or before December 15 of each year, the Maryland Department of Labor shall:
   (1) determine the State average weekly wage as of July 1 of that year; and
   (2) report the State average weekly wage to the Commission.

29

because Mr. Spevak receives $1,859.07 per week in service-connected total disability retirement benefits—an amount that exceeds the maximum workers' compensation award that Mr. Spevak could receive for permanent total disability—any workers' compensation award in this case is fully offset by Mr. Spevak's retirement benefits. Thus, the County asserts that the workers' compensation award here for permanent *partial* disability (21% occupational hearing loss) amounting to $322 per week is, as a matter of law, offset by Mr. Spevak's total disability retirement payments.

As previously noted, Mr. Spevak relies on *Reger's* language that the reference in LE § 9-610 to "similar benefits" "reflects a legislative intent that the offset apply only to 'comparable' benefits, which are **'benefits accruing by reason of the same injury**.'" 455 Md. at 117. Because his back injury and occupational hearing loss resulted in two distinct workers' compensation awards, he invokes *Reger's* language that the benefits are "dissimilar, and the statutory offset does not apply." *Id.*[15]

---

[15] Mr. Spevak also argues that the Legislature demonstrated the ability to limit benefits in LE § 9-503(e), which applies to certain occupational diseases: "benefits received under this title shall be adjusted so that the weekly total of those benefits and retirement benefits does not exceed the weekly salary that was paid." *Polomski v. Mayor & City Council of Balt.*, 344 Md. 70, 82 (1996), held that LE § 9-610 and LE § 9-503 and their predecessors "say different things" and therefore "mean different things." The offset provisions in LE § 9-610(a) and LE § 9-503(e) were both established in 1971. That the Legislature has recodified and repeatedly amended both statutes since then, but has not substantially altered either offset provision after fifty years implies that it is satisfied with the Courts' interpretations. *See Plein v. Dept. of Labor*, 369 Md. 421, 433 (2002) ("[T]he Legislature has shown itself quite capable, and willing, to act decisively and swiftly when the Court does not accurately discern its intent or when it believes the Court has gotten it wrong."); *Giffin v. Crane*, 351 Md. 133, 154 (1998) ("[T]he Legislature is presumed to be aware of decisions of the Court of Appeals, . . . and the Legislature's inaction or action to effect a statutory change must be considered in that light."). In light of the substantial

(continued)

30

Although we cannot know for certain, we doubt that the *Reger* Court intended that its language be broadly applied across the workers' compensation milieu. What our research has taught us is that this legal arena of disability retirement benefits and workers' compensation disability is exceedingly complex, and the decisions are typically fact-specific. *Reger* is distinguishable from the instant case in several ways. First, *Reger*, like most of the other cases we have discussed, is a single injury case—Mr. Reger injured himself at work while moving a cafeteria table. The present case, however, involves two separate work injuries—Mr. Spevak's back injury and his occupational hearing loss. Second, because Mr. Reger was awarded an ordinary disability retirement rather than a service-connected disability retirement, the *Reger* Court was required to examine the evidence that supported his ordinary disability retirement award to determine whether that award was based on a work injury. Indeed, the *Reger* Court stated that "the only relevant inquiry" there was "whether ordinary disability benefits can, as a matter of law be 'similar' to workers' compensation benefits[.]" *Id.* at 118. No such analysis is required in this case because Mr. Spevak's service-connected disability retirement and two workers' compensation injuries are all work-related. Thus, we reject Mr. Spevak's assertion that *Reger* is controlling.

---

caselaw construing the "similar benefits" language of LE § 9-610 over the past fifty years, and the understanding that the General Assembly is aware of such interpretations, we conclude that LE § 9-503(e)'s language that limits the employee's recovery to his or her "weekly salary"—a "wage loss" limitation expressly disavowed by *Reger*—does not inform our interpretation of LE § 9-610.

31

Instead, we hold that a service-connected total disability retirement and a permanent total disability award under workers' compensation law arising from the same employment are "similar benefits" under LE § 9-610. Both sets of benefits are "comparable" because both are based on an employee's service-connected permanent total disability from the same employment. Both sets of benefits are also definitionally comparable. Section 33-43(b) of the Montgomery County Code defines "total incapacity" as the "inability to perform substantial gainful activity because of an impairment." Under workers' compensation law, "total disability" means "incapacity to do work of any kind for which a reasonable market exists." *Montgomery Cty. v. Buckman*, 333 Md. 516, 528 (1994) (analogizing permanent total disability under the Workers' Compensation Act to "total incapacity" under section 33-43 of the Montgomery County Code). Thus, under both definitions, the employee's disabling condition or conditions prevent him or her from working in a reasonable employment market. Accordingly, when an employee is granted a service-connected "total incapacity" disability retirement and a workers' compensation permanent total disability award, the benefits paid are the same whether the total disability is traceable to one work-related injury or multiple work-related injuries. To that extent, the benefits are "similar." And because a permanent total disability award would be subject to the offset, Mr. Spevak's permanent *partial* disability workers' compensation award is *a fortiori* subject to the offset.

We recognize that our holding represents a minor extension of *Tsottles*, where the Court held that the workers' compensation award for sixty percent permanent partial disability caused by the combination of two separate injuries (apparently to the same

32

anatomical part) was subject to an offset against the employee's disability retirement pension. Here, we extend that rule to apply the offset where an employee receives a service-connected total disability retirement from one injury, but subsequently receives a permanent partial disability workers' compensation award from a separate injury. In our view, such a holding is in accord with the frequently articulated legislative intent to prevent double recovery. Indeed, in *Fikar*, the Court of Appeals expressly rejected Ms. Fikar's theory that she was entitled to receive two-thirds of her salary from her service-connected disability retirement plus two-thirds of her salary from the functional equivalent of temporary total disability compensation, stating, "We do not believe that the Legislature intended to allow such a windfall." *See Fikar*, 333 Md. at 439, n.5. Under Mr. Spevak's theory, an employee who sustains two different injuries resulting in permanent total disability could be entitled to both the service-connected total disability retirement (in this case, 70% of final salary) and the permanent total disability payments under workers' compensation law (generally two-thirds of salary). In our view, that result would likewise constitute a windfall not intended by the Legislature.[16]

We therefore hold that because Mr. Spevak's service-connected total disability retirement compensates for any and all work-related injuries he sustained in his

---

[16] To be clear, our holding is based on our view that Mr. Spevak's service-connected total disability retirement benefits are "similar" to workers' compensation permanent total (and partial) disability benefits. We expressly disavow any suggestion that the LE § 9-610 offset applies because the disability retirement benefits and workers' compensation disability benefits provide a similar "wage loss" benefit, a theory that was rejected in *Reger*.

33

employment with Montgomery County, he may not also receive a permanent partial workers' compensation award.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

34